# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|                              |   |                  |
|------------------------------|---|------------------|
| **MICHAEL KOHLMILLER,**      | ) |                  |
|                              | ) |                  |
| **Petitioner,**              | ) |                  |
|                              | ) |                  |
| **v.**                       | ) | **CR No. 06-51E** |
|                              | ) | **CV No. 09-196E** |
| **UNITED STATES OF AMERICA,** | ) |                  |
|                              | ) |                  |
| **Respondent.**              | ) |                  |

## OPINION

Pending before the Court is Petitioner Michael Kohlmiller's *pro se* "Motion Under 28

U.S.C. 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody" ("§ 2255

Motion" or "Section 2255 Motion") [Doc. #49]. Respondent United States of America ("the

Government") has filed a Response to Petitioner's § 2255 Motion [Doc. #53] ("Government's

Response"). For the reasons set forth below, Petitioner's § 2255 Motion is denied.

### I. Background.

On September 12, 2006, a grand jury returned a fifty-seven count indictment against

Michael Kohlmiller ("Petitioner" or "Kohlmiller"); Kohlmiller was charged with forty-five (45)

counts of bank fraud in violation of 18 U.S.C. § 1344, eleven (11) counts of wire fraud in

violation of 18 U.S.C. § 1343, and one (1) count of aggravated identity theft in violation of 18

U.S.C. § 1028A. On March 28, 2007, Kohlmiller pleaded guilty to count one (1) of the

indictment which charged bank fraud in violation of 18 U.S.C. §1344 and count fifty-seven (57)

of the indictment which charged aggravated identity theft in violation of 18 U.S.C. § 1028A. He

also acknowledged responsibility for the conduct charged in counts two (2) through fifty-six (56)

of the indictment and agreed that the Court could consider that conduct in imposing his sentence.

On October 9, 2007, judgment was entered against him and he was sentenced to fifty-one (51) months imprisonment at count 1 and twenty-four (24) months imprisonment at count 57, to be served consecutively, for a total term of seventy-five (75) months. On October 16, 2007, Kohlmiller timely appealed his conviction and sentence to the United States Court of Appeals for the Third Circuit. On direct appeal, the appellate court affirmed the judgment of conviction and sentence. See United States v. Kohlmiller, 304 Fed.Appx. 956 (3d Cir. 2008). On July 31, 2009, Petitioner filed the Section 2255 motion at issue herein.

**II. Standard of Review under 28 U.S.C. § 2255**.

Section 2255 of Title 28 of the United States Code provides a means of collaterally attacking a sentence imposed after a conviction. U.S. v. Cannistraro, 734 F.Supp. 1110, 1119 (D. N.J. 1989), aff'd, 919 F.2d 133 (3d Cir. 1990), cert. den'd, 500 U.S. 916 (1991). Pursuant to 28 U.S.C. § 2255, a federal prisoner may move the sentencing court to vacate, set aside or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Relief under this provision is "generally available only in 'exceptional circumstances' to protect against a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." U.S. v. Gordon, 979 F. Supp. 337, 339 (E.D. Pa. 1997) (citing Hill v. U.S., 368 U.S. 424, 428 (1962)).

The Court must consider the motion together with all the files, records, transcripts and correspondence relating to the judgment under attack. See 28 U.S.C. § 2255, Rule 4(b) of the

2

Rules Governing Section 2255 Proceedings. A district court considering a § 2255 motion "'must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record,'" U.S. v. Booth, 432 F.3d 542, 545 (3d Cir. 2005) (quoting Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1989)), and a court "abuses its discretion if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief." Booth, 432 F.3d at 546 (citing U.S. v. McCoy, 410 F.3d 124, 134 (3d Cir. 2005). However, the final disposition of a § 2255 motion lies with the discretion of the trial judge, see Virgin Islands v. Nicholas, 759 F.2d 1073, 1075 (3d Cir. 1985), and a district court may summarily dismiss a §2255 motion where the motion, files, and records "show conclusively that the movant is not entitled to relief." U.S. v. Mason, 2008 WL 938784, 1 (E.D. Pa. 2008) (citing Forte, 865 F.2d at 62).

"Section 2255 generally may not be employed to relitigate questions which were raised and considered on direct appeal." U.S. v. DeRewal, 10 F.3d 100, 105 n. 4 (3d Cir. 1993) (internal quotations omitted). Moreover, "if a petitioner has failed to raise an objection at the time of trial and has also failed to raise the issue on direct appeal, then collateral review of that claim is procedurally barred unless the petitioner is able to show 'cause' excusing his procedural default and 'actual prejudice' resulting from the alleged error or violation." Henry v. U.S., 913 F.Supp. 334, 335 (M.D. Pa. 1996), aff'd, 96 F.3d 1435 (3d Cir.1996); see also U.S. v. Essig, 10 F.3d 968, 979 (3d Cir.1993) (holding that the "cause and prejudice" standard set forth in U.S. v. Frady, 456 U.S. 152 (1982) "applies to § 2255 proceedings in which a petitioner seeks relief from alleged errors in connection with his sentence that he has not directly appealed"). However, a petitioner need not demonstrate cause and prejudice when raising a claim of ineffective assistance of

3

counsel for the first time in a collateral attack. <u>Massaro v. United States</u>, 538 U.S. 500, 504, 123

S.Ct. 1690, 155 L.Ed.2d 714 (2003)(holding that an "ineffectiveness" claim can be brought in a

collateral proceeding under § 2255 regardless of whether the same issue could have been

addressed on direct appeal); <u>DeRewal</u>, 10 F.3d at 104.

### III. Summary of Arguments.

Petitioner raises a number of substantive arguments in support of his Section 2255

motion. First, he argues that his trial counsel was ineffective for recommending that he waive his

right to pursue a direct appeal, for failing to consider alternative plea agreements, for failing to

challenge the imposition of the "vulnerable victim" and "abuse of position of trust" sentencing

enhancements, for failing to challenge the amount of the loss specified in the indictment, and for

failing to file a sentencing memorandum. Section 2255 Motion, pp. 3-8. In addition, he contends

that the Court erred by failing to properly consider his "history and characteristics" in imposing

his sentence, and by failing to consider whether his sentence was disproportionately longer than

that imposed on other individuals in similar circumstances. Section 2255 Motion, pp. 9-11.

### IV. Legal Analysis.

We first address the Government's contention that "Kohlmiller pled guilty pursuant to a

written plea agreement in which he waived his right to collaterally attack his sentence," and that

"[t]hat waiver is valid and enforceable and precludes this Court from considering the merits of

the issues presented by Kohlmiller." Government's Response, p. 1.

4

**A. Knowing and voluntary waiver issue.**

"A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." U.S. v. Khattak, 273 F.3d 557, 561 (3d Cir. 2001) (citing U.S. v. Mezzanatto, 513 U.S. 196, 201 (1995)). Such waivers are enforceable "provided they are entered into knowingly and voluntarily and their enforcement does not work a miscarriage of justice." U.S. v. Mabry, 536 F.3d 231, 237 (3rd Cir. 2008), cert. den'd, 129 S.Ct. 2789 (2009) (citing Khattak, 273 F.3d at 561).

A court has "an independent obligation to conduct an evaluation of the validity of a collateral waiver." Id. at 238. Specifically, we must examine (1) the "knowing and voluntary nature" of the waiver, based on what occurred and what the defendant contends, and (2) whether the enforcement of the waiver would work a "miscarriage of justice." Id. at 237. "Whereas a defendant bears the burden of presenting an argument that would render his waiver unknowing or involuntary, a court has an affirmative duty both to examine the knowing and voluntary nature of the waiver and to assure itself that its enforcement works no miscarriage of justice, based on the record evidence before it." Id. at 237-238 (citing Khattak, 273 F.3d at 563).

With regard to whether the Petitioner's waiver in this case was knowing and voluntary, we must, at a minimum, "review[] the terms of the plea agreement and change-of-plea colloquy and address[] their sufficiency." Id. at 239. Having done so, we find that it is clear from the terms of the plea agreement and the change of plea colloquy that Kohlmiller's waiver of his right to bring a collateral appeal was knowing and voluntary. Specifically, the plea agreement, which Kohlmiller signed on March 28, 2007, clearly and unequivocally provided: "MICHAEL

5

KOHLMILLER further waives the right to file a motion to vacate sentence, under 28 U.S.C. §2255, attacking his conviction or sentence, and the right to file any other collateral proceeding attacking his conviction or sentence." Plea Agreement, p. 3. Moreover, during the change-of-plea colloquy, it was first explained by the Government that pursuant to the terms of the plea agreement "[h]e also agrees to waive his right to file a collateral attack of his sentence or a habeas petition as listed in the plea letter." Change of Plea Transcript, p. 18. Kohlmiller then was asked the following questions by the Court: (1) "Mr. Kohlmiller, you have just heard what Mr. Trabold [the Government attorney] has said by way of a summary insofar as the plea agreement is concerned, do you agree with the terms and conditions of the plea agreement?;" (2) "[a]nd prior to coming to court today, did you have an opportunity to read and review the plea agreement and discuss its terms with your attorney?;" (3) "[h]aving done so, did you understand those terms?;" and (4) "[d]o you understand that by virtue of affixing your signature to the plea agreement, you are attesting by your signature that you agree with all of its terms and conditions?". Id. at pp. 18-19. Petitioner answered "yes" to all of these questions. Id. Finally, the Court queried: "[d]o you understand that under certain circumstances you or the government may have the right to appeal any sentence which might be imposed; but do you understand that in this specific case, by virtue of the terms of your plea agreement, your appellate rights have been significantly circumscribed, do you understand that?". Id. at p. 21. Kohlmiller stated "Yes." Id. Accordingly, we find Kohlmiller's waiver of his collateral-review rights to have been "knowing and voluntary."

**B. Miscarriage of justice issue.**

Having concluded that Kohlmiller's waiver of his right to bring a collateral appeal was knowing and voluntary, we next consider whether the enforcement of the waiver "would work a miscarriage of justice in this case." Mabry, 536 F.3d at 239. A court is to use a "common sense approach" and "look to the underlying facts to determine whether a miscarriage of justice would be worked by enforcing the waiver." Id. at 242-243. There is no identified list of specific circumstances to consider before invalidating a waiver as involving a miscarriage of justice. Id. The United States Court of Appeals for the Third Circuit, however, has "endorsed the methodology of the Court of Appeals for the First Circuit," and instructed that we should consider "the clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result . . .'" Id. at 242-243 (quoting U.S. v. Teeter, 257 F.3d 14, 25-26 (1st Cir. 2001)).

Most of Kohlmiller's substantive arguments for why manifest injustice will result if we do not consider the merits of his § 2255 Motion fall under the umbrella of ineffective assistance of counsel. "A claim of ineffective assistance requires a defendant to establish that counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant." McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir. 1993), citing Strickland v. Washington, 466 U.S. 668, 687-688 (1984).

7

In assessing the first prong of the Strickland "ineffective assistance of counsel" analysis, the Supreme Court has instructed that "[t]he proper measure of attorney performance" is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. This is an objective standard, and must be "viewed to the extent possible without 'the distorting effects of hindsight.'" Duncan v. Morton, 256 F.3d 189, 200 (3d Cir. 2001) (quoting Strickland, 466 U.S. at 688-90). In addition, a "reviewing court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" McAleese, 1 F.3d at 175 (quoting Strickland, 466 U.S. at 692). "The defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689.

At the second part of the Strickland analysis, "[t]o establish prejudice, a defendant must demonstrate that there is a 'reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Weeks v. Snyder, 219 F.3d 245, 257 (3d Cir. 2000) (quoting Strickland, 466 U.S. at 694). The Supreme Court has explained that a "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." Id. at 694. In making the prejudice determination, the court must consider the totality of the evidence. Id. at 695.

A petitioner's claim of ineffective assistance must identify the specific errors that counsel is alleged to have made. Conclusory allegations are not sufficient to support a petition under Section 2255. Blackledge v. Allison, 431 U.S. 63, 74 (1977). See also U.S. v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000) (citing U.S. v. Dawson, 857 F.2d 923, 928 (3d Cir. 1988) (reiterating that "vague and conclusory allegations contained in a § 2255 petition may be disposed of without

8

further investigation by the District Court.").

### 1. Defense counsel's failure to inform Petitioner of alternative plea options.

The United States Court of Appeals for the Third Circuit has observed that it would constitute a "miscarriage of justice" for a court to enforce a waiver under circumstances in which the petitioner's counsel "was ineffective or coercive in negotiating the very plea agreement that contained the waiver." Mabry, 536 F.3d at 243. Kohlmiller argues that he agreed to the plea bargain (which included waivers of his direct-appeal and collateral-review rights) only because his counsel was "ineffective." Section 2255 Motion, pp. 3-4. To make such a showing, he must first establish that the performance of his counsel "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. This "objective standard of reasonableness" "is necessarily linked to the practice and expectations of the legal community." Padilla v. Kentucky, 130 S.Ct. 1473, 1482, 176 L.Ed.2d 284 (2010). Even if it is determined that the actions of Kohlmiller's counsel were objectively unreasonable, Kohlmiller must still demonstrate that he was prejudiced by his counsel's deficient performance in order to obtain relief (or to show that the enforcement of the collateral-rights waiver in this case would result in a "miscarriage of justice"). Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Where the "ineffective assistance of counsel" argument is made in the "guilty plea" context, the Supreme Court has held that, in order for a defendant to satisfy the "prejudice" requirement of the Strickland test, he must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366 (1985).

9

As an initial matter, it must be noted that the United States Court of Appeals for the Third Circuit has already concluded, on direct review, that Kohlmiller's decision to accept the plea agreement was not the product of constitutionally deficient representation. Kohlmiller, 304 Fed.Appx. at 5-6. The Court of Appeals reasoned that since the plea agreement had resulted in the dismissal of fifty-five of the fifty-seven counts which had been lodged against Kohlmiller, no error on the part of his counsel had been shown. Id. A collateral proceeding such as this generally may not be used to relitigate issues which have already been decided on direct review. DeRewal, 10 F.3d at 105, n. 4; Barton v. United States, 791 F.2d 265, 267 (2d Cir. 1986). We acknowledge that a waiver of direct-appeal rights differs from a waiver of collateral-review rights, and that a waiver of collateral-review rights comes before a habeas court in the first instance when a § 2255 petition is filed. Mabry, 536 F.3d at 238, n. 6. What is actually at issue is Kohlmiller's waiver of his right to pursue the instant petition, not a waiver of his right to file the earlier direct appeal. Nevertheless, in his petition, Kohlmiller appears to base his "ineffectiveness" argument on the direct-appeal waiver rather than on the collateral-review waiver. Section 2255 Motion, pp. 3-4. Moreover, consideration of his counsel's professional reasonableness with respect to the plea agreement (which included both waivers) essentially requires the "same" inquiry to be conducted "at different court levels." Mabry, 536 F.3d at 238, n. 6. Thus, Kohlmiller cannot relitigate the reasonableness of his counsel's actions in the absence of a showing that he "did not receive full and fair consideration" of the matter when it was before the Court of Appeals. United States v. Palumbo, 608 F.2d 529, 533 (3d Cir. 1979)(listing "newly discovered evidence," "a change in the applicable law," "incompetent prior representation by counsel," and "other circumstances indicating that an accused did not receive

10

full and fair consideration of his federal constitutional and statutory claims" as bases for permitting a habeas corpus petitioner to relitigate issues which have already been decided on direct appeal). He does not even attempt to address this issue. Section 2255 Motion, pp. 3-4. Consequently, he cannot pursue collateral relief on the theory that his counsel was ineffective in negotiating the plea agreement, thereby rendering the enforcement of his collateral-review waiver a "miscarriage of justice."

Kohlmiller appears to rely on additional grounds for establishing that his counsel was ineffective. He argues that the plea agreement was "one-sided" because it resulted in consecutive sentences (rather than concurrent sentences) for counts 1 and 57. Section 2255 Motion, p. 3. He contends that if he had opted to plead guilty to the first twenty counts in the indictment (but not count 57), his sentences could have been served concurrently (rather than consecutively), resulting in less prison time. Section 2255 Motion, p. 3.

The indictment contained forty-five (45) counts of bank fraud, eleven (11) counts of wire fraud and one (1) count of aggravated identify theft. Indictment, pp. 6-14. As a part of the plea agreement, the Government agreed to dismiss forty-four of the bank fraud counts and all eleven of the wire fraud counts. Plea Agreement, p. 3. Kohlmiller agreed to plead guilty to the first count of bank fraud and the sole count of aggravated identity theft. Plea Agreement, p. 1. The plea agreement itself specified that Kohlmiller could be sentenced to "[a] term of imprisonment of not more than thirty-two (32) years, including a mandatory two (2) year consecutive sentence on count fifty-seven." Plea Agreement, p. 4. A term of imprisonment of thirty (30) years is the maximum prison sentence that can be imposed on an individual for the crime of bank fraud. 18 U.S.C. § 1344. At the "change of plea" hearing, Kohlmiller was told that his decision to plead

11

guilty to aggravated identity theft would result in a sentence of imprisonment for two years "to run consecutively with any other term imposed." Change of Plea Transcript, p. 17. He responded in the affirmative when asked whether he understood the consequences of his decision to plead guilty to aggravated identity theft. Change of Plea Transcript, p. 17.

The aggravated identity theft statute provides that "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1). Bank fraud is listed as a predicate offense under "subsection (c)" of the aggravated identity theft statute. 18 U.S.C. § 1028A(c)(5). A two-year sentence imposed for aggravated identity theft must run consecutively to (rather than concurrently with) the sentence imposed for the applicable predicate offense. 18 U.S.C. § 1028A(b)(2). A term of imprisonment for aggravated identity theft can run concurrently only with a distinct term of imprisonment for an additional violation of the aggravated identity theft statute. 18 U.S.C. § 1028A(b)(4). Otherwise, "no term of imprisonment imposed on a person under [the aggravated identity theft statute] shall run concurrently with any other term of imprisonment imposed on the person under any other provision of law, including any term of imprisonment imposed for the felony during which the means of identification was transferred, possessed, or used." 18 U.S.C. § 1028A(b)(2). Furthermore, a court may not reduce an individual's sentence for a predicate offense in order to compensate for a two-year consecutive sentence that he or she must serve for aggravated identity theft. 18 U.S.C. § 1028A(b)(3).

As noted earlier, Kohlmiller cannot show that his counsel's performance was deficient with respect to the negotiation of the plea agreement. Even if he could make such a showing, however, he would be unable to satisfy the "prejudice" prong of Strickland. Although Kohlmiller intimates that he could have been offered a better deal, he does not allege that such a deal was offered by the Government. Section 2255 Motion, pp. 3-4. In this context, a petitioner cannot show that he was "prejudiced" by his counsel's advice to accept the terms of a plea agreement simply by asserting that the Government *may* have offered him a better deal if his counsel had pressed harder during plea negotiations. Burger v. Kemp, 483 U.S. 776, 785-786, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); Jones v. Jones, 163 F.3d 285, 307 (5th Cir. 1998); Spreitz v. Ryan, 617 F.Supp.2d 887, 918 (D.Ariz. 2009). In order to establish that he was "prejudiced" by the specific terms of his plea bargain, Kohlmiller must provide some evidence that the Government was amenable to a deal that was more favorable to him. Eisemann v. Herbert, 401 F.3d 102, 109-110 (2d Cir. 2005). Since he provides no such evidence, he would be unable to establish "prejudice" even if his counsel's performance had been objectively unreasonable.

A finding of ineffective assistance of counsel cannot be based on pure speculation that a better deal would have been offered by the Government. Spreitz, 617 F.Supp.2d at 918. Hence, the Court's analysis need go no further with respect to this issue. It is worth noting, however, that the terms of the plea agreement itself suggest that the Government wanted to ensure that Kohlmiller would serve a mandatory consecutive two-year sentence for aggravated identity theft in addition to whatever sentence would be imposed for one count of bank fraud. The first bank fraud count appears to have been used as the predicate offense for the aggravated identity theft conviction, thereby providing a basis for the consecutive two-year sentence. Plea Agreement. Since the plea agreement at issue appears to have been precisely calibrated to facilitate the

imposition of the consecutive sentence, it is doubtful that the Government would have seriously considered a deal permitting Kohlmiller to serve concurrent sentences for multiple acts of bank fraud and wire fraud. Accordingly, the enforcement of the plea agreement (including the collateral-review waiver) will not constitute a "miscarriage of justice."

**2. Defense counsel's failure to challenge the application of enhancement points.**

Kohlmiller's sentence of fifty-one (51) months of imprisonment for the bank fraud conviction was consistent with his offense level of twenty-two (22), which provided for an advisory sentence ranging from forty-one (41) months to fifty-one (51) months. If Kohlmiller's offense level had been eighteen (18) instead of twenty-two (22), the guidelines would have called for a sentence ranging from twenty-seven (27) months to thirty-three (33) months for the bank fraud conviction. U.S.S.G. Ch. 5, Pt. A, Sentencing Table. Kohlmiller argues that his counsel was ineffective for failing to object to two sentencing enhancements, each of which added two points to his offense level. Section 2255 Motion, pp. 5-6. The sentencing enhancements at issue are the "vulnerable victim" enhancement and the "abuse of position of trust" enhancement. U.S.S.G. §§ 3A1.1(b)(1), 3B1.3. The "vulnerable victim" enhancement provides for a two-level increase where it is established that "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). The "abuse of position of trust" enhancement provides for a two-level increase where it is shown that "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Kohlmiller argues that these enhancements should not have been applied to his offense level (and resulting sentence), and that it would be a "miscarriage of justice" for the Court to enforce his collateral-review waiver in this situation.

14

In determining whether the "vulnerable victim" enhancement is applicable, a court must consider whether the victim of the relevant offense was "particularly susceptible or vulnerable" to the defendant's criminal conduct, whether "the defendant knew or should have known of this susceptibility or vulnerability," and whether "this vulnerability or susceptibility facilitated the defendant's crime in some manner." United States v. Iannone, 184 F.3d 214, 220 (3d Cir. 1999). A victim's vulnerability "facilitates" a crime where there is "a nexus between the victim's vulnerability and the crime's ultimate success." United States v. Lee, 973 F.2d 832, 834 (10th Cir. 1992). The enhancement may be applied where the defendant *knew* or *should have known* of the victim's vulnerability, regardless of whether the defendant consciously targeted the victim *because* of that vulnerability. United States v. Monostra, 125 F.3d 183, 190 (3d Cir. 1997). For purposes of the enhancement, the relevant "victim" can be either a natural person or an entity. Id. at 189. Moreover, for the enhancement to be applicable, "the victim injured by the defendant's *relevant conduct* need not also be injured by the offense of conviction." United States v. Zats, 298 F.3d 182, 187 (3d Cir. 2002)(emphasis added). "[V]ictims can be particularly vulnerable if they are financially insecure, sick, in a state of emergency, or otherwise susceptible to the particular kind of criminal conduct at issue." United States v. Kennedy, 554 F.3d 415, 424 (3d Cir. 2009).

The factors supporting the application of the sentencing enhancements at issue can only be understood by reference to the conduct engaged in by Kohlmiller. When asked by the Court at the "change of plea" hearing what the Government would be able to prove if Kohlmiller's case were to proceed to trial, the prosecutor stated as follows:

> Your Honor, the government's proof in this case comes from interviews from a variety of individuals who had business dealings with Mr. Kohlmiller. As well as a review of all the loan applications that Mr. Kohlmiller either submitted

or caused to be submitted to the three financial institutions listed in the Indictment. Which are all funds that are insured by the government. Those financial institutions would be Northwest Savings Bank, the Community Bank of Olean, New York, and the Erie Federal Credit Union.

The evidence in this case would be that Mr. Kohlmiller owned and operated Township Automotive, essentially a used car dealership in Millcreek Township, from approximately November of 2002 to July of 2005. And he engaged in a scheme and artifice to defraud the financial institutions I just mentioned from approximately August of 2003 to August of 2005.

And the evidence would be that the scheme and artifice to defraud took several different forms. The main form that the scheme took was Mr. Kohlmiller would approach friends, associates, acquaintances, and ask them to take out an automobile loan in their name for an automobile that he had on his car lot. He indicated to them that in almost all of the cases they would not actually take possession of the vehicle, the vehicle would remain on the Township Automotive lot, and he would make monthly installment payments for them. And that the goal of doing this was essentially so that he could make it look as if he was moving inventory through his auto dealership, as well as the fact that essentially what he would be getting would be a loan to him from the bank without the bank knowing that they were essentially giving him the loan, because the money for the sale of the auto would go to Mr. Kohlmiller, he could then make installment payments on it unbeknownst to the bank.

Secondly, that scheme was essentially repeated with a number of Mr. Kohlmiller's employees. He went to the employees, asked them to take loans out in their name, the vehicles would remain on Township Automotive's lot. In a few circumstances the customer or employee would actually take possession of the car or the automobile, but in most circumstances those autos would remain on the Township lot. And, again, the purpose that he expressed to several of the employees specifically, was for him to be able to show that inventory was moving, that he was conducting business on a regular basis. As well as the obvious fact that he was able to obtain funds from the bank in essentially a loan type situation, which he would not have ordinarily been able to obtain from the bank in all likelihood.

Mr. Kohlmiller would then falsely indicate to the bank during the course of these transactions that he had obtained the title to the vehicles that are the subject of the auto loans listed in the Indictment. That he obtained those titles to those autos from the automobile wholesaler. When he in fact in almost all cases, perhaps not in all cases, but in many of cases, he had not in fact obtained the title from the automobile wholesaler and the title had remained with the automobile wholesaler. He would falsely indicate to the bank that he had obtained the title. And that the ultimate purchaser of the vehicle would have the title subject to the bank's loan. The title was never transferred from the wholesaler to Mr. Kohlmiller himself or to the business. So in many of these cases what you had was the bank would issue an auto loan, record a lien on the auto, that would result in a car that had two competing liens, one from the financial institution as a result

16

of the auto loan, and the liens that the wholesaler kept on the vehicle.

Additionally, in furtherance of this scheme, Mr. Kohlmiller would actually provide the bank a copy, usually doing this by fax, of the title, which indicated that he had obtained the title and that the title had properly been transferred from the wholesaler to him, and then on to the purchaser of the vehicle, subject obviously to the financial institution's lien, which went on a result of the automobile loan.

Mr. Kohlmiller would then essentially, once he received the money from the bank as a result of the loan, would fail then to transmit in many of the cases that money to the automobile wholesaler, essentially resulting in him getting to keep the money which he should have transmitted on to the wholesaler after taking his cut as a result of the sale.

Additionally, as part of this scheme and artifice to defraud, in a number of cases, specifically those listed in the Indictment, Mr. Kohlmiller used means of identification, which he was not authorized to use, in obtaining automobile loans in a number of the automobile loans listed in the Indictment. Specifically, he used names, Social Security numbers, the dates of birth, the driver's licenses, and the driver's license numbers of a number of different people who never authorized Mr. Kohlmiller to use that information on their behalf for the purpose of obtaining an automobile loan.

What would essentially happen in these cases, Mr. Kohlmiller would submit an automobile loan application with means of identification which he had essentially stolen. An automobile loan would issue. The payment book would go to the person in whose name, whose identity he had stolen. That person would then take the payment book, in a number of circumstances, to Mr. Kohlmiller and say, Mike, what's going on here, why do I have an automobile loan from Township Automotive that I don't know anything about. He would then, as listed in the Indictment, tell the person that's just a paperwork snafu or a paperwork problem, don't worry, I'll take care of it for you, you're not on the hook for that loan. Give me the paperwork, give me the book or give me the paperwork and I'll take care of it. In almost every single one of those cases, Mr. Kohlmiller did nothing to rectify the situation, and in fact at the very close of this case, many of those folks who had their identity stolen or means of identification stolen, were brought into a meeting with one of Mr. Kohlmiller's civil attorneys and these payment books were handed back out to them and they were told you are now on the hook for paying these automobile loans. Many of these people had never agreed to pay and never provided their information.

> As a result of this scheme and artifice to defraud, Mr. Kohlmiller obtained slightly over $831,000. And that would be the nature of the government's case.

Change of Plea Transcript, pp. 22-27. Kohlmiller acknowledged that he had engaged in the conduct described by the prosecutor. Change of Plea Transcript, p. 27.

In light of Kohlmiller's admitted conduct, the record clearly establishes that Kohlmiller had close personal relationships with many of his victims. As a part of the plea agreement, Kohlmiller acknowledged his responsibility for the conduct charged in the fifty-five counts that were being dismissed, and he stipulated that such conduct could be considered by the Probation Office and the Court in determining the length of his sentence. Plea Agreement, p. 2. To establish the applicability of the "vulnerable victim" enhancement, the Government need only prove that a *single victim* was vulnerable or susceptible to the criminal conduct at issue. Zats, 298 F.3d at 190; United States v. Smith, 133 F.3d 737, 749 (10th Cir. 1997). In United States v. Hawes, 523 F.3d 245, 255 (3d Cir. 2008), the United States Court of Appeals for the Third Circuit recognized that one's "close personal relationship" with a defendant could render one "vulnerable or susceptible" to fraud committed by that defendant. In that case, the Court of Appeals observed that the defendant's own parents could not have been "more susceptible" to his fraudulent activities. Hawes, 523 F.3d at 255. Because the record indicates that Kohlmiller's crimes were directly "facilitated" by his close personal relationships with many of the victims, his counsel was not "ineffective" for failing to object to the two-point increase in his offense level resulting from the application of the "vulnerable victim" enhancement.

In determining whether the "abuse of position of trust" enhancement is applicable, a court must consider the degree of difficulty in detecting the relevant offense in light of the defendant's position, the degree of authority vested in the defendant in relation to the wrongful action, and

18

the degree of reliance placed on the integrity of the defendant because of his or her position. United States v. Hart, 273 F.3d 363, 376 (3d Cir. 2001). An "abuse of trust" occurs where a party "relies on another's integrity for protection against the loss occasioned by the crime, and where the trust aspect of the position ma[kes] the commission of the crime easier." United States v. Thomas, 315 F.3d 190, 205 (3d Cir. 2002). For purposes of this analysis, it must be remembered that Kohlmiller's victims included both financial institutions and individuals. "[T]he question of whether an individual occupies a position of trust should be addressed from the perspective of the victim." United States v. Queen, 4 F.3d 925, 929 (10th Cir. 1993).

As the owner and operator of a used-car dealership, Kohlmiller was in a position to commit a "difficult-to-detect" wrong from the perspective of the financial institutions that were defrauded. United States v. Dullum, 560 F.3d 133, 140-141 (3d Cir. 2009). His affirmative efforts to engender the reliance of both the financial institutions and the involved individuals on his trustworthiness is certainly relevant to the inquiry. United States v. Hoffecker, 530 F.3d 137, 202 (3d Cir. 2008). As he admitted during the "change of plea" colloquy, Kohlmiller had total control over the loan money that he had fraudulently obtained from the financial institutions, and he did not use that money to make the installment payments that he had promised to make. Moreover, the financial institutions and the relevant individuals relied on his integrity. The financial institutions provided the loans because of Kohlmiller's position as the owner and operator of a used-car dealership, and the individuals agreed to take out the loans because of Kohlmiller's assurances that he would make the installment payments. The "abuse of position of trust" enhancement was properly applied to Kohlmiller's sentence. Consequently, his counsel was not "ineffective" for failing to challenge that enhancement, and no "miscarriage of justice" will result from the enforcement of his collateral-review waiver.

### 3. Defense counsel's failure to challenge the amount of the loss.

Kohlmiller argues that his counsel was ineffective for failing to challenge the $660,481.26 figure identified as the amount lost by his victims and, hence, the amount of restitution owed by him. Section 2255 Motion, p. 7. He points out that if the amount of the loss had been less than $400,000.00, his offense level would have been decreased by two points, resulting in a shorter sentence. Section 2255 Motion, p. 7. He contends that his counsel should have challenged the Government's calculation of the amount of the loss. Section 2255 Motion, p. 7.

The problem with Kohlmiller's argument is that it begs the question. He makes no attempt to show that the amount of the loss was, in fact, less than $660,481.26. Counsel cannot be deemed to have been ineffective for failing to raise a meritless argument. Real v. Shannon, 600 F.3d 302, 310 (3d Cir. 2010). Moreover, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." Strickland, 466 U.S. at 693. In order to meet his burden of demonstrating prejudice, Kohlmiller must show that there is a "reasonable probability" that his offense level would have been decreased had his counsel raised a challenge to the Government's "amount of the loss" figure. Albanese v. United States, 415 F.Supp.2d 244, 253 (S.D.N.Y. 2005). Because Kohlmiller does not even purport to argue that a challenge to the $660,481.26 figure would have made a difference, no "miscarriage of justice" will result from the enforcement of the plea agreement, which included a waiver of Kohlmiller's right to bring the instant proceeding.

### 4. Defense counsel's failure to file a sentencing memorandum.

Kohlmiller asserts that his counsel was ineffective for failing to file a sentencing memorandum with the Court. Section 2255 Motion, p. 8. He contends that his counsel should have argued for a downward departure from the guidelines. Section 2255 Motion, p. 8. Nevertheless, he does not point to anything in the record that would warrant a finding that such a downward departure would have been granted. Consequently, he cannot show that the performance of his counsel was objectively unreasonable, or that he was prejudiced by this allegedly deficient performance in any event. United States v. Gomez, 100 F.Supp.2d 1038, 1045-1046 (D.S.D. 2000). Under these circumstances, the enforcement of Kohlmiller's collateral-review waiver will not constitute a "miscarriage of justice."

### 5. The Court's alleged sentencing errors.

Kohlmiller argues that the Court erred at the time of sentencing in failing to consider his "history and characteristics" within the meaning of 18 U.S.C. § 3553(a)(1), and in failing to consider disparities between the sentence imposed on him and the sentences imposed on other individuals under similar circumstances. Section 2255 Motion, pp. 9-11. While the Court was required to adequately consider all relevant § 3553(a) factors, it was under no obligation to specifically discuss each factor during the course of the sentencing hearing. United States v. Cooper, 437 F.3d 324, 329 (3d Cir. 2006). In any event, however, the collateral remedy available to prisoners under § 2255 "does not encompass all claimed errors in conviction and sentencing." United States v. Addonizio, 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). The Supreme Court has held that "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" Id., quoting Hill, 368 U.S. at 428. The crux of Kohlmiller's argument is

21

not that the Court made a specific error, but rather that its inattention to generalized sentencing factors resulted in the imposition of an improperly long sentence. Section 2255 Motion, pp. 9-11. Kohlmiller does not explain how further research or findings by the Court would have altered his sentence. Thus, his claims "fall far short" of the "miscarriage of justice" standard. Knight v. United States, 37 F.3d 769, 773 (1st Cir. 1994). "[T]he concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas." United States v. Timmreck, 441 U.S. 780, 784, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979). That is especially true in this case, since Kohlmiller voluntarily waived his right to seek collateral relief. Since no underlying "miscarriage of justice" exists to warrant collateral relief to begin with, it follows *a fortiori* that no "miscarriage of justice" will result from the enforcement of Kohlmiller's voluntary waiver.

**V. No Need for an Evidentiary Hearing.**

When a motion is made under 28 U.S.C. § 2255, the question of whether to order a hearing is committed to the sound discretion of the district court. In exercising that discretion, the court must accept the truth of the Petitioner's factual allegations unless they are clearly frivolous on the basis of the existing record, Booth, 432 F.3d at 545, and the court must order an evidentiary hearing to determine the facts unless the motion, files and records of the case show conclusively that the petitioner is not entitled to relief. U.S. v. Day, 969 F.2d 39, 41-42 (3d Cir. 1992); United States v. Gordon, 979 F. Supp. 337, 339 (E.D. Pa. 1997). Here, we find no need for an evidentiary hearing, since the record conclusively establishes that Kohlmiller is not entitled to the relief sought in his § 2255 Motion.

## VI. Certificate of Appealability.

The remaining issue before this Court is whether a certificate of appealability ("COA") should be issued with respect to Kohlmiller's § 2255 Motion. A court should issue a certificate of appealability where a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner meets this burden by showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595 (2000). We find that jurists of reason would not find our assessment of Kohlmiller's constitutional claims to be either debatable or wrong. Therefore, the Court will deny a certificate of appealability.

## VI. Conclusion.

Petitioner's § 2255 Motion is denied, and a certificate of appealability will not be issued. An appropriate order will be entered.

Date: August 17, 2010

Maurice B. Cohill Jr.
Maurice B. Cohill, Jr.
United States District Court Senior Judge